## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| TONI LYNN CAMAC, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civ. No. 07-21-LPS |
| | : |
| MICHAEL J. ASTRUE,[1] | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

Gary C. Linarducci, LINARDUCCI & BUTLER, Wilmington, Delaware, Attorney for Plaintiff.

Colm F. Connolly, United States Attorney, and Dina White Griffin, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wilmington, Delaware; Michael McGaughran, Regional Chief Counsel, SOCIAL SECURITY ADMINISTRATION, Philadelphia, Pennsylvania, Attorneys for Defendant.

## MEMORANDUM OPINION

September 29, 2008
Wilmington, Delaware

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the former Commissioner Jo Anne B. Barnhart.

**STARK, U.S. Magistrate Judge**

## I. INTRODUCTION

Plaintiff Toni Lynn Camac ("Camac") appeals from a decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-33. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

Presently pending before the Court are cross-motions for summary judgment filed by Camac and the Commissioner. (D.I. 11,14) Camac's motion for summary judgment asks the Court to award her DIB. (D.I. 11) The Commissioner's motion for summary judgment requests that the Court affirm his decision and enter judgment in his favor. (D.I. 14) For the reasons set forth below, Camac's motion for summary judgment will be denied and the Commissioner's motion for summary judgment will be granted.

## II. BACKGROUND

### A.   Procedural History

Camac filed the application for DIB at issue in this case on July 18, 2003. *See* D.I. 7 (Transcript (hereinafter "Tr.")) at 72-74. That application was denied on October 24, 2003 and again denied on reconsideration on January 29, 2004. Tr. at 48-52, 54-58. After a requested hearing, an administrative law judge (ALJ) issued a decision on August 5, 2005 denying benefits. Tr. at 16-29. On November 24, 2006, the Appeals Council denied Camac's request for review. Tr. at 9-11. Thus, the ALJ's August 5, 2005 adverse decision became the final decision of the Commissioner. *See* Tr. at 9-11; *see also* 20 C.F.R. §§ 404.955, 404.981; *Sims v. Apfel*, 530 U.S. 103, 107 (2000).

1

On January 11, 2007, Camac filed a Complaint seeking judicial review of the ALJ's August 5, 2005 decision. (D.I. 1)  On July 26, 2007, Camac moved for summary judgment. (D.I. 11)  The Commissioner filed a cross-motion for summary judgment on August 28, 2007. (D.I. 14)  Thereafter, on March 27, 2008, the parties consented to the jurisdiction of a United States Magistrate Judge. (D.I. 22)

## B.    Factual Background

### 1.    Camac's Medical History, Treatment, And Condition

At the time she filed the relevant DIB application in July 2003, Camac was 40 years old. Tr. at 72-74.  She has a high school education.  Tr. at 784-85.  Between approximately 1991 and December 20, 1999, she was employed either on full or part-time bases, working primarily as a customer service representative and then briefly as a telemarketer.  Tr. at 167, 785-87.

Camac claims to have been disabled since December 20, 1999 as a result of a work-related accident that occurred in 1997.  Tr. at 72-74.[2]  Her claimed disability arises from several problems, including back pain and depression.  Tr. at 128, 137.[3]

#### a.    Physical Impairments

Camac has a history of low back and left-leg pain dating to 1995.  Tr. at 169-71.  In June 1997, she injured her lumbosacral spine after she fell out of a broken chair at work.  Tr. at 172.  On March 25, 1998, Camac underwent a decompression laminectomy of L5-S1 with right discectomy

---

[2]The last day upon which Camac was insured for purposes of DIB was March 31, 2005. Tr. at 20.

[3]Camac also has a reported history of hypertension.  While she has on occasion identified this condition as an additional impairment, *see* Tr. at 128, 137, it is being controlled with medication, Tr. at 790.  The ALJ did not make specific findings related to Camac's hypertension, Tr. at 22, and Camac does not raise this condition in her briefing before the Court.

and foraminotomy and posterior spinal fusion of the L4-S1 with an iliac bone graft. Tr. at 183-92. Camac's post-operative diagnosis was chronic lumbar disc syndrome with mechanical low back pain and right radiculopathy. Tr. at 188.

On January 19, 2000, Camac complained of progressive low back pain and paresthesia in her right lower extremity. Tr. at 236. In response, Yakov U. Koyfman, a neurosurgeon, reported that a lumbar MRI showed no significant abnormality confirming compression of the neural elements. *Id.* His overall diagnostic impression was mechanical low back pain and some elements of lumbar radiculopathy. Tr. at 237. He therefore recommended a lumbar myelogram and an EMG of Camac's right lower extremity. *Id.*

An electromyographic study performed on January 26, 2000 showed acute L5 radiculopathy on the right side. Tr. at 229. The L4 and S1 segments appeared to be normal, and there was no polyneuropathy. *Id.* A subsequent January 27, 2000 lumbar myelogram demonstrated lumbar radiculopathy. Tr. at 230-34. Additionally, a CT scan of Camac's lumbar spine revealed post-operative changes at multiple levels and bulging of the annulus with a small right posterolateral disc protrusion at the second most superior disc space level examined. Tr. at 332-33.

On June 21, 2000, Camac underwent surgery with orthopedist Ali Kalamchi for right L4-5 decompression, laminectomy, foraminotomy, and removal of the pedicular instrumentation at L4 to S1. Tr. at 242-43, 245-46. Soon after her surgery, on August 21, 2000, Dr. Kalamchi reported that Camac had been involved in a motor vehicle accident on July 24, 2000. Tr. at 249. She bruised her leg and lower back, but did not have any other major injuries. *Id.* She had also been undergoing physical therapy. *Id.* He noted that Camac's gait was normal, she had a good range of motion of her lumbar spine, she had no sensory or motor deficits of her lower limbs, and a straight leg-raising

3

test was negative bilaterally. *Id.*[4] Dr. Kalamchi said Camac's back pain was much better than it had been pre-operatively. *Id.*

On September 15, 2000, a state agency physician completed a physical residual functional capacity assessment ("PRFCA") based upon an examination of Camac's file. Tr. at 564-72. The state consultant assessed Camac's residual functional capacity, concluding that Camac was capable of performing sedentary work and that she could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk (with normal breaks) for a total of "at least 2 hours in an 8-hour workday," and sit (with normal breaks) for a total of "about 6 hours in an 8-hour workday." Tr. at 565, 571. The state consultant also indicated that Camac could "occasionally" climb, balance, stoop, kneel, crouch, or crawl. Tr. at 567. No manipulative, visual, communicative, or environmental limitations were indicated. Tr. at 567-68.

On November 20, 2000, Dr. Kalamchi reported that Camac was doing "very well" and experiencing "very little back discomfort" and no leg symptoms. Tr. at 249. Camac told Dr. Kalamchi that her right leg pain had "improved dramatically" since her surgery. *Id.* Dr. Kalamchi was "very pleased with her progress" and noted that she had good range of motion of her lumbar spine, her SLR tests were negative, and she had no sensory or motor deficits of her lower limbs. *Id.*

A few months later, on March 13, 2001, orthopedist Jerry L. Case examined Camac. Tr. at 310-12. Dr. Case reported that Camac walked with a normal gait. Tr. at 311. He noted that her laminectomy over the lower back was non-tender, but she had mild tenderness to the right of L5. *Id.*

---

[4]The straight leg-raising test (SLR) is used to evaluate possible nerve root pressure, tension, or irritation of the sciatic nerve. With the knee fully extended, the physician raises the involved leg from the examining table. A positive SLR test, the most important sign of nerve root pressure produced by disc herniation, would require reproduction of pain at an elevation of less than 60 degrees. (D.I. 15 at 5 n.1)

4

Camac's flexion was to 60 degrees and her extension was to 15 degrees. *Id.* Her heel and toe walking was normal[5] and she had no muscle spasm. *Id.* Camac's hip motion was normal with no atrophy, and her reflexes were normal in her lower extremities. *Id.* Camac stated that she did light housework and took Percocet as needed, sometimes two to four per day. *Id.* At other times she took Ultram. *Id.* Camac did not wear a back brace; she did perform some home stretching. *Id.* Dr. Case diagnosed status post decompression and laminectomy/diskectomy L5-S1, with spine fusion at L4-S1, as well as status post right L4 decompression and removal of pedicular instrumentation from L4-S1. *Id.* Subsequently, on March 14, 2001, Camac had a right S1 selective nerve root injection. Tr. at 330. Dr. Case later indicated that, as of March 20, 2001, he thought Camac was capable of full-time sedentary to light duty work with no repeated bending and twisting, and no lifting over 15-20 pounds. Tr. at 309.

On October 25, 2001, Camac underwent placement of dorsal column stimulation trial electrodes in her thoracolumbar spinal area. Tr. at 328. Camac did not attain adequate stimulation or relief, however, and the temporary electrodes were removed on October 29, 2001. Tr. at 326.

On January 29, 2002, Camac's family practice physician, John E. Hocutt, Jr. wrote a note indicating that Camac was "still permanently disabled" and was "unable to work," and that her next appointment was scheduled for approximately 6 weeks later. Tr. at 344. At her followup visit on March 25, 2002, Dr. Hocutt noted that Camac's back pain had decreased, that she had been feeling better, and that she had no trouble driving. Tr. at 340. In a subsequent visit on August 8, 2002, Dr. Hocutt noted that Camac's back pain continued. Tr. at 339.

---

[5]Physicians test toe and heel walking because difficulty with toe walking indicates compromise of the S1 nerve root, while difficulty with heel walking suggests compromise of the L5 nerve root. (D.I. 15 at 6 n.2)

Camac was required by Disability Determination Services to undergo a medical evaluation by Yong K. Kim. On October 15, 2003, Dr. Kim examined Camac. Tr. at 454-59. In his written evaluation, Dr. Kim reported that the range of motion of Camac's upper and lower extremities was within normal limits with no joint swelling or edema noted. Tr. at 455. The range of motion of Camac's cervical spine was within normal limits but her trunk flexion was limited to 45 degrees with increasing low back pain. *Id.* Moderate tenderness existed in the sacroiliac area, and mild muscle tightness was noted in the lumbar paraspinal muscles. *Id.* Dr. Kim noted that Camac appeared to be depressed, with decreased facial expression, but also that she was alert, oriented and cooperative, and her memory was intact. *Id.* She had decreased sensation along the right L5 and S1 dermatome levels as compared to the left side. *Id.* Upon examination, Camac's muscle strength of both her upper and lower extremities was within normal limits with no atrophy noted. *Id.* A straight leg-raising test was negative bilaterally and she could stand and walk on both her toes and heels. *Id.* Her gait was within normal limits. *Id.* Dr. Kim diagnosed status post lumbar fusion with residual pain and ruled out lumbosacral radiculopathy. *Id.* Dr. Kim opined that Camac should be "limited to 4-6 hours" of walking and standing in an 8-hour workday due to low back pain and right leg pain. *Id.* Moreover, her sitting was recommended to be "limited to 4-6 hours" during an 8-hour workday due to low back pain. *Id.* Dr. Kim also limited Camac's lifting to 20 pounds. *Id.*

On September 29, 2003, a state agency physician assessed Camac's residual functional capacity, relying initially on Dr. Hocutt's January 29, 2002 opinion of disability. Tr. at 425-35. However, less than one month later, on October 23, 2003, after reviewing Dr. Kim's intervening evaluation, the state consultant prepared another report, reassessing and concluding that Camac was capable of performing a limited range of light work. Tr. at 460-67. Due to obesity, however, the

6

state agency physician opined that Camac's maximum residual functional capacity might be no more than the sedentary level. Tr. at 467. The state agency physician indicated that the September 29, 2003 assessment should be read in conjunction with the newer assessment to reflect the changed opinion in light of the more recent evidence. Tr. at 466-67. In the newer report, the state consultant indicated that Camac could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of "at least 2 hours in an 8-hour workday," and sit (with normal breaks) for a total of "about 6 hours in an 8-hour workday." Tr. at 461. The state consultant also indicated that Camac could "occasionally" climb, balance, stoop, kneel, crouch, or crawl. Tr. at 462. No manipulative, visual, or communicative limitations were indicated. Tr. at 463-64. The only environmental limitation that the state consultant indicated was that Camac should avoid concentrated exposure to extreme cold and vibrations. Tr. at 464.

On a consultation visit on November 12, 2003, orthopedist Bruce J. Rudin reported that Camac walked with a normal gait and rose easily from a sitting position. Tr. at 501. Camac's forward flexion was 2 feet from the floor with low back pain and right lateral leg pain. *Id.* Her extension was normal. *Id.* Camac had a negative straight leg raise bilaterally and no clonus. *Id.* Her reflexes were 2+ and symmetrical, her motor examination was 5/5 and equal, and her sensory examination was intact. *Id.*

On December 18, 2003, Peter M. Witherell, a pain management specialist, saw Camac upon referral from Dr. Rudin regarding her complaint of pain in the right lower lumbar region of her back. Dr. Witherell reported that Camac's motor and sensory functions were intact in her upper extremities and that her reflexes were symmetric. Tr. at 712-13. With respect to her lower extremities, a straight leg-raising test was negative bilaterally, her motor strength was 5/5 in her

7

major muscle groups, her sensation was bilaterally intact, and her reflexes were 2+ bilateral patellar and +1 bilateral Achilles. Tr. at 712. Dr. Witherell diagnosed mechanical lower back pain status post previous posterior L4-L5 fusion with subsequent removal of hardware and suggestion of possible discogenic etiology. *Id.* He also diagnosed lumbar radicular pain which was then less severe in comparison to her low back discomfort. *Id.* He noted that Camac had received extensive treatment, including physical therapy and nerve injection in the lumbar region, and had been treated with several medications over the past several years. Tr. at 713. Dr. Witherell recommended that Camac undergo provocative discography. Tr. at 712. Thereafter, Camac underwent an L3-4 and L4-5 provocative discography on January 12, 2004 for lumbosacral degenerative disc disease. Tr. at 709.

On January 28, 2004, Vinod Kataeri, a state agency physician, reviewed Camac's medical records and completed a PRFCA. Tr. at 534-41. In his PRFCA, Dr. Kataeri assessed that Camac was capable of performing light work that required no climbing of ladders, ropes, or scaffolds, and that she could, with normal breaks, stand and/or walk for about 6 hours, as well as sit for about 6 hours, in an 8-hour workday. Tr. at 535-36. He indicated that Camac could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, and that she was capable of frequently climbing ramps or stairs. *Id.* No manipulative, visual, or communicative limitations were indicated. Tr. at 537-38. The only environmental limitation was that Camac should not be exposed to hazards. Tr. at 538.

Camac subsequently received various treatments. On February 2, 2004, Dr. Witherell administered a bilateral L3-L4 intraarticular lumbar facet joint injection for lumbar spondylosis. Tr. at 708. On March 1, 2004, Camac underwent a bilateral L3-L4 intraarticular zygapophyseal joint

8

injection with local anesthetic and steroid as treatment for lumbar spondylosis. Tr. at 707. On

March 15, 2004, Dr. Witherell performed a bilateral radiofrequency ablation at the L3-L4 facet

joints. Tr. at 705, 707. On May 13, 2004, Dr. Witherell reported that Camac had continued

improvement in her characteristic lower back pain following the lumbar facet ablation, and had

intact bilateral sensation and motor function with 5/5 strength in all major muscle groups. Tr. at

701. She also benefitted from the recent use of Duragesic, with minimal side effects. *Id.* Camac

had no new complaints and her residual discomfort was centered over her lower back region without

radiation to her lower extremities. *Id.* Dr. Witherell characterized Camac's mechanical low back

pain, lumbar spondylosis as "stable." *Id.* On July 15, 2004, Dr. Witherell continued to report that

Camac's low back pain remained stable, her motor function was 5/5 in the major muscle groups,

and he noted improvement in her lumbar facet pain. Tr. at 699-700. She had moderate pain in her

upper lumbar area and had occasional pain in her sacral and lower extremities, which was positional

and related to exertion. Tr. at 699. Advising her to continue her conservative course of therapy, Dr.

Witherell also indicated that he believed Camac was incapable of performing even sedentary work

due to her pain. Tr. at 700.

A few months later, on October 21, 2004, Dr. Witherell reported that Camac had a mild

recurrence of her characteristic mid to lower lumbar spinal discomfort, similar to the discomfort she

had experienced prior to her lumbar facet ablation. Tr. at 697. Dr. Witherell recommended an

intraarticular injection at L3-L4. Tr. at 698. Thereafter, on November 10, 2004, Dr. Witherell

administered a bilateral L3-L4 intraarticular injection of a local anesthetic and steroid. Tr. at 696.

On December 1, 2004, Camac reported a 60 to 70% improvement in her pain. Tr. at 694. Dr.

Witherell also performed a bilateral L3-L4 facet radiofrequency ablation to provide longer-term

9

relief. *Id.* On December 16, 2004, Camac reported tenderness in her back region following the radiofrequency ablation. Tr. at 692. Her motor function was 5/5 in the major muscle groups of her upper and lower extremities. *Id.* Dr. Witherell opined that Camac's symptoms appeared to be primarily myofascial. Tr. at 693. He noted that Camac was early in her postop course and that she was neurologically intact. *Id.* Dr. Witherell planned to continue with conservative care, and he advised Camac to continue with her medications (Percocet and Duragesic) as prescribed. *Id.* Also, under the care of Dr. Witherell, on February 16, 2005, Camac underwent right sacroiliac and right bursa joint injections. Tr. at 720. Camac described a substantial reduction in pain within 15 minutes after the procedure. *Id.*

On February 21, 2005, Dr. Witherell completed a residual functional capacity evaluation form, opining that Camac was not capable of performing any work on a regular and continuing basis due to intractable low back pain. Tr. at 723-27. He stated that Camac could lift no more than 5 pounds on an occasional basis, stand/walk for 5 to 10 minutes at one time, and stand/walk for a total of 60 minutes in an 8-hour workday. Tr. at 723. He further opined that Camac could sit for no more than 15 minutes at one time and for no more than one hour in an 8-hour workday. Tr. at 725. He indicated that she could never twist, stoop, or crouch, that she could rarely climb stairs or ladders, reach, or push/pull, and that she could frequently perform activities involving gross and fine manipulation and feeling. *Id.* Dr. Witherell felt that Camac's pain would always interfere with her ability to attend work. Tr. at 726.

### b.  Mental Impairments

At the Commissioner's request, Frederick Kurz, Ph.D., performed a clinical psychological evaluation on November 21, 2000. Tr. at 578-81. Dr. Kurz reported that Camac functioned within

10

the average to above average range of intelligence and memory. Tr. at 580. He noted that there did

not appear to be any distractions due to her physical discomfort and that she appeared to be able to

maintain concentration and attention throughout the examination. *Id.* She had moderate levels of

depression but no thought or personality disorders. *Id.* Dr. Kurz diagnosed adjustment reaction

disorder with depressed features. *Id.* He rated Camac's global assessment of functioning ("GAF")

score at 70. *Id.*[6] Moreover, Dr. Kurz opined that Camac should be capable of handling her own

funds. *Id.*

On September 30, 2003, Janet Brandon, Ph.D., a state agency psychologist, completed a

"Psychiatric Review Technique" form ("PRT") and a mental residual functional capacity assessment

("MRFCA"). Tr. at 436-53. In the PRT, Dr. Brandon indicated that Camac had mild restriction of

the activities of daily living, mild difficulties in maintaining social functioning and "concentration,

persistence, or pace," but no reported episodes of decompensation. Tr. at 446. Dr. Brandon

concluded that while the "MER [medical evidence of record] substantiates pain syndrome," the

"MER does not substantiate [a] disabling mental condition." Tr. at 448.

In the MRFCA, Dr. Brandon found Camac was not significantly limited in most work-

related activities, and assessed no more than moderate limitations in regard to Camac's ability to

perform several work-related activities. Tr. at 449-53. Dr. Brandon indicated that Camac was not

significantly limited in her ability to remember locations, work-like procedures, or short and simple

---

[6]The GAF scale is a numeric scale from zero through 100 and is used by mental health clinicians to rate the occupational, psychological, and social functioning of adults. The scale was devised by the American Psychiatric Association. A GAF score in the 61 to 70 range indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but general ability to function well, including by having meaningful interpersonal relationships. *See* D.I. 15 at 12 n.3.

11

instructions, but was moderately limited in the ability to understand and remember detailed instructions. Tr. at 449. Dr. Brandon reported that Camac was not significantly limited in carrying out short and simple instructions, performing activities within a schedule, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, or making simple work-related decisions. *Id.* However, Dr. Brandon indicated that Camac was moderately limited in carrying out detailed instructions, maintaining attention and concentration for extended periods, completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without unreasonably long and frequent rest periods. Tr. at 449-50. Dr. Brandon also found that Camac was not significantly limited in interacting appropriately with the general public, asking simple questions, requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, or maintaining socially appropriate behavior and adhering to the basic standards of neatness and cleanliness. Tr. at 450. Finally, Dr. Brandon indicated that Camac's abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or using public transportation, set realistic goals, and make plans independently of others were not significantly limited. *Id.* While Dr. Brandon wrote that Camac's "pain could be distracting [and/or] affect tasks," she also noted that Camac was "showing some favorable response to med[ication]s." Tr. at 451, 453.

On January 15, 2004, psychiatrist Robert C. Cohn, who had first evaluated Camac on April 16, 2001 and had most recently seen her on December 22, 2003, completed a psychiatric assessment form. Tr. at 542-55. Her presenting problem and chief complaints were depressed mood and

12

chronic pain. Tr. at 542. Dr. Cohn reported that Camac's mood was low but her association and thought processes and content were intact, as were her perception, sensorium, memory, orientation, intellectual functioning, insight, and judgment. Tr. at 543-44. Dr. Cohn rated Camac's GAF score at 50. Tr. at 544.[7] Camac's strengths were that she was cooperative and intelligent and had a good psychological history prior to her physical problems. *Id.* Her depressed mood appeared to be related to chronic pain. *Id.* Dr. Cohn noted that Camac was able to care for herself and interact with others, as well as handle her own benefits. Tr. at 546. He noted that he had not seen her in six months and that she had missed two appointments. Tr. at 547. He recommended that she taper down and discontinue taking Paxil and begin a trial of Effexor. *Id.*

On January 28, 2004, Pedro M. Ferreira, Ph.D., a state agency psychologist, completed a PRT form and MRFCA. Tr. at 518-33. As reported in the PRT, while he found that Camac had bipolar 1 disorder and experienced a medically determinable single manic episode without psychotic features, Dr. Ferreira assessed that Camac had only mild restriction of the activities of daily living, no difficulties in maintaining social functioning, mild difficulties in maintaining "concentration, persistence, or pace," and no episodes of decompensation. Tr. at 521, 528.

In the MRFCA, Dr. Ferreira found Camac was not significantly limited in most work-related activities, and he assessed no more than moderate limitations in regard to Camac's ability to perform several work-related activities. Tr. at 532-33. Dr. Ferreira indicated that Camac was not significantly limited in her ability to remember locations, work-like procedures, or short and simple instructions, but was moderately limited in the ability to understand and remember detailed

---

[7]A GAF score in the 41-50 range indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* D.I. 15 at 13 n.4.

13

instructions. Tr. at 532. Camac was not significantly limited in carrying out short and simple instructions, maintaining attention and concentration for extended periods, performing activities within a schedule, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, making simple work-related decisions, or completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods. Tr. at 532-33. However, Dr. Ferreira indicated that Camac was moderately limited in carrying out detailed instructions. Tr. at 532. Camac was not significantly limited in interacting appropriately with the general public, asking simple questions, requesting assistance, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, or maintaining socially appropriate behavior and adhering to the basic standards of neatness and cleanliness. Tr. at 450. Finally, Dr. Ferreira indicated that Camac's abilities to be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, set realistic goals, or make plans independently of others were not significantly limited. *Id.*

On March 22, 2005, Dr. Cohn completed a Mental Impairment Questionnaire. Tr. at 730-34. Dr. Cohn reported that he had seen Camac approximately every 3 to 4 months. Tr. at 730. He rated her current GAF at 55-60, and her highest GAF for the past year at 60. *Id.*[8] He opined that Camac's impairments would be expected to cause her to miss work more than 3 times per month. Tr. at 731.

---

[8]A global assessment of functioning in the 51 to 60 range indicates some moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See* D.I. 15 at 14 n.5.

14

With respect to her functional limitations, Dr. Cohn indicated that Camac had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, often had deficiencies of "concentration, persistence, or pace," and had repeated episodes of decompensation. Tr. at 733. In connection with her mental abilities and aptitude to do unskilled work, Dr. Cohn reported that Camac was incapable of performing at a consistent pace without an unreasonable number and length of rest periods. Tr. at 732. He felt she was seriously limited but not precluded in her ability to: remember work-like procedures; understand, remember and carry out detailed instructions; interact appropriately with the general public; travel in unfamiliar places or use public transportation; set realistic goals or make plans independently of others; accept instructions and respond appropriately to criticism from supervisors; deal with normal work stress and stress of semiskilled and skilled work; maintain attention and concentration for extended periods; maintain regular attendance and perform activities within a schedule; sustain an ordinary routine without special supervision; make simple work-related decisions; and complete a normal workday and workweek without interruptions from psychologically based symptoms. Tr. at 732-33. Dr. Cohn also reported that Camac possessed the capability to: satisfactorily understand, remember and carry out short and simple instructions; work in coordination with or proximity to others without being distracted by them; be aware of normal hazards and take appropriate precautions; maintain socially appropriate behavior and adhere to the basic standards of neatness and cleanliness; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; ask simple questions and request assistance; and respond appropriately to changes in a routine work setting. *Id.* He further believed that Camac would be capable of managing benefits in her own best interest. Tr. at 734.

15

## 2.     The Administrative Hearing

At Camac's administrative hearing, held on July 14, 2005 via video teleconference, the ALJ heard testimony from Camac and from Sandra Mullen, an impartial vocational expert. Tr. at 778-810.[9]

### a.     Camac's Testimony

Camac testified that during the relevant period she had problems with back pain and depression that severely limited her daily functioning. Tr. at 787-802. For example, the strong narcotic medications she received made her "tired all the time." *Id.* at 794. She used ice packs to help control her pain, and said that "the only way I can relieve it is to lay straight down to keep my leg straight, my back straight. When it really hurts bad I just try to go to sleep to make it stop or to make it feel like it stops." *Id.* She testified that she has pain every day and experiences spasms and suffers from depression. Tr. at 789-91. She testified that she could walk for about 15 minutes and that steps are "very difficult" for her. Tr. at 794. She can only "sit for 15 minutes at the most." *Id.* at 795. Camac can lift "[f]ive pounds maybe;" she is limited in her ability to bend forward at the waist and cannot kneel down or stoop over to pick something off the floor. *Id.* While she has difficulty sleeping and "can't sleep but maybe one to two hours straight at most," she also spends most of her days just laying down in bed, for about 6 out of the 8 hours between 9 a.m. and 5 p.m. daily. Tr. at 796, 799. In addition to crying several times per week and experiencing panic attacks lasting an hour "at least once a day," she wants to be away from people, has trouble with memory and concentration, and suffers from irritability and mood swings. Tr. at 791-93. Additionally,

---

[9]Camac, her husband, her attorney, and the independent vocational expert appeared at the New Castle, Delaware hearing office, while the ALJ conducted the hearing from an office in Dover, Delaware. Tr. at 780-82.

16

Camac testified that she had trouble with daily activities, stating that "I can't do anything, I can't move some days, I can't clean my house, I can't take care of my kids." Tr. at 793.

Camac added, however, that medicine was "controlling [her depression] enough" and that she could climb the stairs of her home 2 to 3 times per day, make light meals, do some vacuuming and dusting, change the bed sheets with assistance, go grocery shopping (if she was only getting a few items), run errands, do laundry with assistance, attend her children's school activities, sometimes eat out at restaurants, visit her mother, handle the family finances, spend leisure time reading, and take a vacation. Tr. at 791, 795-99, 801.

### b. The Vocational Expert's Testimony

At the hearing, Sandra Mullen, the vocational expert ("VE"), was asked by the ALJ to consider a hypothetical individual with Camac's age, education, and vocational characteristics who was limited to simple, unskilled light or sedentary work which involved occasional postural limitations regarding balancing, stooping, kneeling, crouching, and crawling – except for no climbing of ladders, ropes, or scaffolds, and no concentrated exposure to extremes of cold or hazards. Tr. at 804. The VE testified that the hypothetical individual with such limitations could perform Camac's past relevant unskilled sedentary work as a telemarketer. Tr. at 803-05.

In a followup question, the ALJ asked the VE: "if there were additional limitations and this person would need to be able to get up and shift positions, I think it's commonly called a sit/stand option, would that telemarketing job be able to accommodate that any?" to which the VE responded, "I don't believe that that job would be able to accommodate that need." Tr. at 804-05.

### 3. The ALJ's Findings

On August 5, 2005, the ALJ issued the following findings:

17

1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act [(the "Act")], and is insured for benefits through March 31, 2005.

2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.    The claimant's lumbar degenerative disk disease and depression are considered "severe" based on the requirements in the Regulations at 20 CFR § 404.1520(c).

4.    These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.    The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.    The claimant has the residual functional capacity to perform a significant range of sedentary work.  She can occasionally able [sic] to climb stairs and ramps, and occasionally balance, stoop, kneel, crouch and crawl but never climb ladders, ropes or scaffolds.  She is limited to simple, unskilled work and must avoid concentrated exposure to cold and hazards.

7.    The claimant's past relevant work as telemarketer did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8.    The claimant's medically determinable lumbar degenerative disc disease and depression do not prevent the claimant from performing her past relevant work.

9.    The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(f)).

Tr. at 28-29.

## III. STANDARD OF REVIEW

### A.    Motion For Summary Judgment

Both parties filed motions for summary judgment pursuant to Federal Rule of Civil

Procedure 56(c). In determining the appropriateness of summary judgment, the Court must "review the record taken as a whole . . . draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000) (internal citation and quotation marks omitted). If the Court is able to determine that "there is no genuine issue as to any material fact" and that the movant is entitled to judgment as a matter of law, summary judgment is appropriate. *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Fed. R. Civ. P. 56(c)).

## B.    Review Of ALJ Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart,* 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour*, 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel*, 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. Jul. 11, 2001).

19

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence –

particularly certain types of evidence (e.g., that offered by treating physicians) – or if it really

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

1983).

Thus, the inquiry is not whether the Court would have made the same determination, but

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently, it

must give deference to the ALJ and affirm the Commissioner's decision if it is supported by

substantial evidence. *See Monsour*, 239 F.3d at 1190-91.

## IV.  DISCUSSION

**A.      Disability Determination Process**

Title II of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment of

insurance benefits to persons who have contributed to the program and who suffer from a physical

or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). In order to qualify for DIB, the

claimant must establish that he or she was disabled prior to the date he or she was last insured. *See*

20 C.F.R. § 404.131; *Matullo v. Bowen*, 926 F.2d 240, 244 (3d Cir. 1990). A "disability" is defined

as the inability to do any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can

be expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§

423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if his physical or mental impairment or

20

impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir.1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. *See* 20 C.F.R. § 404.1520(a)(4).

At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. *See* 20 C.F.R. § 404.1520(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. *See* 20 C.F.R. § 404.1520(a)(4)(ii) (mandating finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e).

At step four, the Commissioner determines whether the claimant retains the residual

21

functional capacity ("RFC") to perform her past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Massanari*, 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## B. The ALJ's Decision Is Supported By Substantial Evidence

On appeal, Camac presents two arguments: (1) the ALJ made a mistake of law by giving more weight to the opinions of the non-treating physicians than the treating sources; and (2) the ALJ's decision is not based on substantial evidence because the hypothetical question posed to the VE did not contain all of Camac's medical limitations. As explained below, however, the Court

22

finds substantial evidence to support the Commissioner on both of these points.

### 1.     The ALJ Properly Evaluated The Physician Opinion Evidence

The primary issue raised by Camac is whether the ALJ incorrectly evaluated the physician opinion evidence in derogation of Social Security regulations and rulings by improperly discounting the opinions of disability offered by treating physicians Witherell and Cohn. (D.I. 12 at 16-24) Camac further argues that the ALJ wrongly relied on the conclusions of the state agency physicians and, in doing so, misunderstood and mischaracterized the content of those consultants' reports. *Id.*

Contrary to Camac's contentions, the Court finds that the treating physician opinions were not entitled to controlling weight as they were inconsistent with other substantial evidence of record, which documented less severe limitations. Further, the ALJ properly assessed and accorded significant weight to the opinions of other examining physicians, Drs. Case and Kim, and the opinions of the non-examining state agency physicians, which were consistent with the objective medical evidence as well as Camac's reported daily activities.

The Third Circuit has held that the opinions of treating or examining sources may not always be controlling, even as against opinions of state agency reviewing physicians or psychologists. *See Jones v. Sullivan*, 954 F.2d 125, 128-29 (3d Cir. 1991). It is true that, generally, more weight is given to opinions from treating sources. *See* 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-2p. However, because non-examining state agency medical and psychological consultants are "highly qualified" physicians and psychologists and "experts in the evaluation of the medical issues in disability claims under the [Social Security] Act," their opinions on a claimant's residual functional capacity are also entitled to weight. 20 C.F.R. § 404.1527(f); S.S.R. 96-6p. Therefore, when there is conflicting evidence, including medical opinions, an ALJ may decide whether a claimant is disabled after

23

carefully evaluating all available evidence. *See* 20 C.F.R. § 404.1527(c)(2); *see also Jones*, 954 F.2d at 128-29. Further, "[w]here . . . the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (internal quotation marks omitted).

### a. Physical Assessments

#### (1) Examining Physicians

Here, the opinions of the treating physicians conflicted with those of the non-treating physicians and the ALJ chose whom to credit. In choosing to discount the treating physicians' assessments, the ALJ did not rely solely upon the opinions of non-examining state medical consultants. Rather, the ALJ also relied upon the opinions of Drs. Case and Kim, both of whom had examined Camac. Tr. at 26.

The examining physicians were not of the uniform opinion that Camac was disabled. Contrary to Dr. Witherell's opinion of indefinite disability, Tr. at 723, Dr. Case opined that Camac was capable of performing full-time sedentary to light duty work with no repeated bending and twisting and no lifting over 15-20 pounds, Tr. at 26, 309. Dr. Kim opined that Camac could stand and walk for 4-6 hours and sit for 4-6 hours, during an 8-hour workday, and lift up to 20 pounds. Tr. at 26, 455. As noted by the ALJ, Drs. Case's and Kim's opinions regarding Camac's residual functional capacity were well-supported by the medical evidence, including Camac's full medical history and clinical objective signs and findings. Tr. at 26; *see* 20 C.F.R. § 404.1527(a).

Throughout the record, for example, Camac's physicians consistently reported that her gait was normal, straight leg-raising tests were negative, and her sensory functions and muscle strength

24

were intact in her upper and lower extremities. Tr. at 249, 310-11, 455, 501, 692. Even Dr.
Witherell reported, on December 18, 2003, that Camac's motor and sensory functions were intact in
her upper extremities and her reflexes were symmetric. Tr. at 712. With respect to Camac's lower
extremities, Dr. Witherell reported a straight leg-raising test was negative bilaterally, motor strength
was 5/5 in the major muscle groups, sensation was bilaterally intact, and reflexes were 2+ bilateral
patellar and +1 bilateral Achilles. *Id.* In July 2004, Dr. Witherell reported that Camac was stable
and that her motor strength was 5/5 in the major muscle groups; he also noted improvement in
Camac's lumbar facet pain post status radiofrequency ablation in March 2004 and advised her to
continue her conservative course of therapy. Tr. at 700. In December 2004, although Camac had
some myofascial pain, Dr. Witherell again reported that her motor strength was 5/5 in the major
muscle groups of her upper and lower extremities. Tr. at 692-93. He further noted that she was
early in her preoperative course and was neurologically intact, repeating his advice of continuing a
conservative course of treatment. *Id.* at 693. These objective medical findings supported Drs.
Case's and Kim's residual functional capacity assessments and were inconsistent with Dr.
Witherell's ultimate opinion of unqualified disability. The weight given by the ALJ to the
examining physicians' opinions was supported by substantial evidence.

### (2)   Non-Examining Physicians

The ALJ assigned significant weight to the assessments of the non-examining state agency
medical consultants. Tr. at 27. Camac faults the ALJ for doing so, but her criticisms are
unpersuasive.

Camac misunderstands Dr. Kataeri's notations regarding her postural limitations. (D.I. 12 at
20) In the Court's view, it is at least apparent that Dr. Kataeri's notations indicate that Camac can

25

"frequently" climb ramps and stairs but never climb ladders, ropes, or scaffolds. Tr. at 536. Such limitations are at least supportive of the ALJ's even more conservative finding that she can only "occasionally" climb stairs and ramps, and are consistent with Camac's reported daily activities of climbing the stairs in her home 2-3 times daily. Tr. at 27-28, 795. Camac's confusion as to whether Dr. Kataeri indicated that Camac was capable or incapable of balancing, stooping, kneeling, crouching, and crawling on a frequent basis, *see* D.I. 12 at 20; Tr at 536, is of no import. Such functions are not required for sedentary work, including Camac's past relevant unskilled sedentary work as a telemarketer.

Camac is also troubled that the ALJ relied upon the state consultant opinion rendered on September 29, 2003, which does not appear to indicate that Camac could perform a significant range of sedentary work, in contrast to the ALJ's statement about that report. *See* D.I. 12 at 19; Tr. at 26, 425-35. But the same state agency physician, less than a month later, indicated that the September 29, 2003 opinion had to be read in conjunction with that physician's updated opinion of October 23, 2003. Tr. at 467. In the October 23, 2003 opinion, which was based on the intervening and most recent evidence of Dr. Kim's consultative examination, the state consultant assessed that Camac was capable of performing a limited range of light work. Tr. at 460-67. However, due to her obesity, the state agency physician opined that Camac's maximum residual functional capacity might be reduced to the sedentary level. Tr. at 467. The Court finds that this is consistent with the ALJ's indication that this state agency physician found that Camac could perform a significant range of sedentary work. Tr. at 26.[10]

_____

[10]Camac criticizes the ALJ relying on "an opinion by an anonymous person." (D.I. 12 at 19) She is referring to the ALJ's reference to Exhibit 44, a September 15, 2000 PRFCA completed by someone whom the ALJ describes only as "a state medical consultant." Tr. at 26.

###### b.     Mental Assessments

With regard to Camac's mental impairments, Dr. Cohn's March 22, 2005 report, which

expressed his opinion of disability, was internally inconsistent.  Contrary to his determination that

Camac was unable to work due to her psychological limitations, Dr. Cohn rated Camac's GAF score

at 55-60, indicating only moderate psychological symptoms.  Tr. at 730.  Moreover, the Court is

unable to find evidence in the record indicating that Camac ever had any episodes of psychiatric

decompensation, contrary to Dr. Cohn's assessment that she had such episodes on a "repeated"

basis.  Tr. at 733.  Even Dr. Cohn's earlier January 15, 2004 report similarly contradicted his

opinion of disability.  On that date, Dr. Cohn reported that there were no deficiencies with regard to

Camac's association and thought processes, thought content, perception, sensorium, memory,

orientation, intellectual functioning, insight, and judgment.  Tr. at 543-44.  He noted that she was

able to care for herself and interact with others, as well as handle her own benefits.  Tr. at 546.

Dr. Cohn's opinion of disability was further contradicted by the opinions of other physicians.

For example, Dr. Kurz reported that Camac functioned within the average to above average range in

terms of intelligence and memory, and he rated her GAF score at 70, indicating only mild

-------------------

In light of the entire record, it was not necessary for the ALJ to know the name or even the
specialty (if any) of the state medical consultant in order to give some weight to this opinion.
Three of the four PRFCAs cited in the ALJ's opinion are from a "state medical consultant" who
is not identified by name.  Tr. at 26-27.  All four of the PRFCAs consistently find Camac capable
of performing at least sedentary work – including the one Camac criticizes, which was completed
more than three years prior to any of the others.  Moreover, it appears that the PRFCA in Exhibit
44 – like the PRFCAs contained in Exhibits 26 and 29, also cited by the ALJ – was prepared by
state medical consultant "M. Burk, M.D."  The handwriting on all three of these exhibits, as well
as the "Medical Consultant's Code" of "12," appear to be the same on each, and the signature on
each appears to state "M. Burk MD."  *See* Tr. at 425-35, 460-67, 564-72; *see also Stevens v.
Barnhart*, 2003 WL 22749815, at *9 (D. Del. Nov. 14, 2003) (describing an "M. Burk, M.D." as
a physician for the Delaware Health and Social Services Agency charged with reviewing social
security claimant medical records).

27

psychological symptoms. Tr. at 580. Both Drs. Brandon and Ferreira found that Camac had only mild restriction of the activities of daily living, mild or no difficulties in maintaining social functioning, mild difficulties in maintaining "concentration, persistence, or pace," and no reported episodes of decompensation. Tr. at 446, 528.

### c. Daily Activities

Camac's own account of her daily activities and capabilities was inconsistent with a functional disability. Camac reported an extensive list of activities of daily living including driving, cooking, cleaning, shopping, running errands, attending her children's activities, eating out at restaurants, visiting with her mother, reading, and handling the family finances. Tr. at 796-99. These activities were inconsistent with an individual who was allegedly experiencing severe physical impairments and debilitating psychiatric symptoms.

\* \* \*

In sum, Drs. Witherell's and Cohn's opinions of disability were conclusory, unsupported by the objective medical evidence, and internally contradictory, while the opinions of Drs. Case and Kim and the non-examining physicians were consistent with the substantial evidence of record. The ultimate determination of disability is a legal conclusion reserved exclusively for the ALJ. *See* 20 C.F.R. § 404.1527(d)(2); § 404.1527(e)(1) & (3); S.S.R. 96-5p. Here, there is substantial evidence to support the ALJ's conclusion that treating physicians Witherell's and Cohn's opinions were not entitled to controlling weight, and, in this instance, the opinions of the other physicians and psychological consultants (examining and non-examining) were entitled to comparatively more weight. Consequently, the Court finds substantial evidence to support the ALJ's conclusion that Camac "is capable of functioning in [a] competitive work environment," physically as well as

28

psychologically.  Tr. at 27.

### 2.    The ALJ's Hypothetical Question To The VE

Camac further argues that the ALJ's hypothetical question to the VE did not account for all

of her functional limitations.  (D.I. 12 at 25-28)  Camac contends that the ALJ ignored the VE's

testimony that the job of telemarketer could not be performed by an individual requiring a sit/stand

option.  (D.I. 12 at 27; Tr. at 804-05)  However, the Court agrees with defendant that the ALJ's

hypothetical question properly accounted for all of Camac's functional limitations that were

supported by the evidence of record.  There is substantial evidence to support the ALJ's conclusion

that these limitations did not prevent Camac from performing her past work as a telemarketer.

"While the ALJ may proffer a variety of assumptions to the expert, the vocational expert's

testimony concerning a claimant's ability to perform alternative employment may only be considered

for purposes of determining disability if the question accurately portrays the claimant's individual

physical and mental impairments."  *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  A

hypothetical question posed to a vocational expert "must reflect all of a claimant's impairments."

*Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987).  Where there exists in the record

medically undisputed evidence of specific impairments not included in a hypothetical question to a

vocational expert, the expert's response is not considered substantial evidence.  *See Podedworny*,

745 F.2d at 218; *see also Burns v. Barnhart*, 312 F.3d 113, 123 (3d Cir. 2002).

While Camac argues that the ALJ did not consider all of her medical limitations and,

specifically, that the ALJ failed to include a sit/stand option in the hypothetical posed to the VE, *see*

D.I. 12 at 27, the Court finds that the objective medical evidence supported the ALJ's exclusion of a

sit/stand option.  Camac's physicians consistently reported that her gait was normal, straight

29

leg-raising tests were negative, she had no sensory deficits or motor deficits of her lower limbs, and her sensory functions and muscle strength were intact in her upper and lower extremities. Tr. at 249, 310-11, 455, 501, 692, 712. It was not necessary for the ALJ to account for any limitations found in the residual functional capacity assessment of Dr. Witherell and/or the Mental Impairment Questionnaire of Dr. Cohn because the limitations described therein were already found by the ALJ to be lacking in support by the substantial evidence of record.

The ALJ's determination in this regard was not inconsistent with the medical recommendations based on the objective medical evidence. Although Dr. Case, a non-treating physician, commented on March 13, 2001 that Camac "need[ed] the opportunity to get up and move around periodically," he did not specify the need for a sit/stand option in his March 19, 2001 letter outlining Camac's functional limitations. Tr. at 309, 312. Dr. Kim did not find that Camac required a sit/stand option. Tr. at 455. His consultative examination report expressed only that "[w]alking and standing will be limited to 4-6 hours during an 8 hour day due to low back pain and right leg pain. Sitting will be limited to 4-6 hours during an 8 hour day due to low back pain." Tr. at 455.

Camac contends that Dr. Kim's recommended "4-6 hour" limitations effectively require a sit/stand option. She reads the Dictionary of Occupation Titles ("DOT") to require that an individual expected to perform sedentary work be capable of sitting precisely 6 hours in an 8-hour workday. (D.I. 12 at 26-27) This argument is unpersuasive.

According to 20 C.F.R. § 404.1567, a "sedentary" job is one that

involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

30

In discussing sedentary work, S.S.R. 96-9p further provides that "[s]itting would generally total about 6 hours of an 8-hour workday." *See also id.* ("[I]n order to perform a full range of sedentary work, an individual must be able to remain in a seated position for *approximately* 6 hours of an 8-hour workday.") (emphasis added). The DOT definition is consistent, describing sedentary work as involving "sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met." DOT § 299.357-014 (4th ed. rev. 1991).

Camac has the RFC to do sedentary work as so defined. For instance, as noted, examining physician Dr. Kim opined that Camac could stand/walk for 4-6 hours and sit for 4-6 hours during an 8-hour workday. Tr. at 455. Likewise, non-examining physician Dr. Kataeri opined that Camac could, with normal breaks in an 8-hour workday, stand and/or walk for approximately 6 hours and sit for about 6 hours. Tr. at 535-36. *See also Kauger v. Barnhart*, 2005 WL 3357151, at *5 (W.D. Va. Dec. 8, 2005) (finding ALJ correctly determined that claimant could return to past work as information operator and perform full range of sedentary work activity because she could "sit[] approximately six hours in an eight hour workday"); *De Paula v. Sec'y of Health and Human Servs.*, 580 F. Supp. 1580, 1582 (S.D.N.Y. 1984) (determining ALJ's finding that claimant could perform sedentary work was supported by substantial evidence including that claimant could "sit for up to four to six hours a day"). None of the reviewing state agency physicians indicated that Camac "must periodically alternate sitting and standing to relieve pain or discomfort." Tr. at 461, 535, 565. To the contrary, each of the state consultants upon whom the ALJ relied assessed Camac's residual functional capacity and concluded that she could perform a significant range of sedentary or light work.

31

A sit/stand option, then, would be based solely upon Camac's subjective complaints. However, there was substantial evidence to support the ALJ's finding that Camac's subjective complaints were inconsistent with the objective medical evidence and Camac's own hearing testimony. Camac's testimony at the July 14, 2005 hearing indicates that her daily activities were wide-ranging. She could climb the stairs of her home 2 to 3 times per day, make light meals, do some vacuuming and dusting, change the bed sheets with assistance, go grocery shopping to get a few items, do laundry with assistance, run errands, attend her children's school activities, eat out at restaurants, visit her mother, handle the family finances, spend leisure time reading, and take a vacation. Tr. at 791, 795-99, 801. Similarly, in her August 24, 2003 Daily Activities Questionnaire, Camac reported that she was able to get her son up and ready for school, drive him there on a daily basis, attend his school and sporting events, wash dishes, go grocery shopping for small items, prepare food and cook meals, do laundry and fold clothes, read novels, watch television, attend to her personal hygiene, dust, and visit with friends. Tr. at 146-53. Camac also told Dr. Case she could do light housework. Tr. at 311.

Thus, there is substantial evidence for the ALJ's assessment of Camac's RFC, including the ALJ's rejection of a sit/stand limitation.[11] There was, thus, substantial evidence to support the ALJ's decision to rely on the VE's testimony that Camac could return to her past relevant work. Tr. at 28-29, 803-05. Camac failed to meet her burden at step 4 of the analysis. Summary judgment for the Commissioner must follow. *See Plummer*, 186 F.3d at 428 ("The claimant bears the burden of

---

[11]Thus, the VE's testimony that if a hypothetical individual in Camac's situation required a sit/stand option then that individual could not perform a telemarketing job is irrelevant. *See* Tr. at 804-05.

demonstrating an inability to return to her past relevant work.").[12]

## V. CONCLUSION

For the reasons set forth in this Memorandum Opinion, Camac's motion for summary

judgment will be DENIED and the Commissioner's motion for summary judgment will be

GRANTED.  An appropriate Order follows.

---

[12]At step 4, the burden is on Camac, and not the Commissioner.  Therefore, Camac's criticisms that the VE did not expressly state whether the past relevant work a hypothetical individual like her could perform was the telemarketer or customer service representative job, or testify whether such jobs were available in the economy, are of no consequence.

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TONI LYNN CAMAC, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civ. No. 07-21-LPS |
| | : | |
| MICHAEL J. ASTRUE,[1] | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

## **ORDER**

At Wilmington this 29th day of September, 2008, consistent with the Memorandum Opinion issued this same date, IT IS HEREBY ORDERED that:

1.   Defendant's cross-motion for summary judgment (D.I. 14) is GRANTED.

2.   Plaintiff's motion for summary judgment (D.I. 11) is DENIED.

3.   The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff.

Leonard P. Stark
United States Magistrate Judge

---

[1]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Accordingly, pursuant to Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted for the former Commissioner Jo Anne B. Barnhart.